**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

**COURTNEY SANDERS**                                                                                    **PLAINTIFF**

**v.**                                      **Case No. 5:12-cv-017 KGB**

**DONALD BOBBITT, as President of the**
**University of Arkansas System,**
**CALVIN JOHNSON, in his official capacity,**
**MARY BENJAMIN, individually and in her**
**official capacity**                                                                                    **DEFENDANTS**

**OPINION AND ORDER**

Plaintiff Courtney Sanders brings this action under 42 U.S.C. § 1983 against Donald

Bobbitt, University of Arkansas System President, in his official capacity; Dr. Mary Benjamin,

Vice-Chancellor for Academic Affairs at the University of Arkansas at Pine Bluff ("UAPB"), in

her individual and official capacity; and Calvin Johnson, Interim Chancellor at UAPB, in his

official capacity, as successor to Lawrence Davis.  Ms. Sanders alleges defendants violated her

rights under the First Amendment and Due Process Clause of the United States Constitution.

She seeks monetary damages only from Dr. Benjamin in her individual capacity.  On August 8,

2013, defendants filed a motion for summary judgment (Dkt. No. 24).  On September 3, 2013,

Ms. Sanders filed her response in opposition to defendants' motion for summary judgment (Dkt.

No. 32).  On September 9, 2013, defendants filed a reply to Ms. Sanders's response (Dkt. No.

36).  For the reasons that follow, defendants' motion is granted.

## I.     Factual Background

The following facts are undisputed unless stated otherwise.[1]  Ms. Sanders entered the

UAPB nursing program in August 2006.  After failing a class and reentering the program, Ms.

Sanders was scheduled to graduate in May 2010 when she and six classmates (collectively, the

"Cohort of 7") failed the course work for Clinical Practicum (NURS-4801), the capstone course,

in the Spring of 2010.  Consequently, the Cohort of 7 were ineligible to take and pass the HESI

Comprehensive Exit Exam ("HESI"), a requirement for passing the course and receiving a

nursing degree.  According to the 2010-2011 HESI, to be eligible to take the HESI, a student

must have completed the course work, including the final exam, and passed Theory and/or

Clinical Practicum with a 75% or better.  If the student failed the course, the student is not

eligible to take the HESI and must reapply to the nursing program and retake the course.  If

eligible to take the HESI, the student has three opportunities to score a 900 or higher.  If the

student is unsuccessful on the third try, a failing grade will be entered and the student must

reapply to the nursing program and retake the course.

After receiving their failing grades for Clinical Practicum, Ms. Sanders and the Cohort of

7 complained to administrators.  Ms. Sanders, the Cohort of 7, and other UAPB nursing students

also complained to the Arkansas State Board of Nursing ("ASBN"), which has regulatory

authority over Arkansas nursing schools, about "grade falsification," incompetent instructors,

and retaliatory treatment by instructors.  In April 2010, Ms. Sanders filed a grievance regarding

her final grade in Clinical Practicum.  Specifically, Ms. Sanders protested the students' lack of

notice on the class's grading policies and changing due dates, lack of credit for turned-in

---

[1]   The undisputed facts are taken from defendants' statement of undisputed facts (Dkt.
No. 26) and Ms. Sanders's response to defendants' statement of undisputed facts (Dkt. No. 33),
unless otherwise specified by specific citation.

assignments, and lack of instructions and review for tests.   A committee considered Ms. Sanders's grievances at a hearing but upheld the decision of her instructor.

The ten members of Ms. Sanders's class who passed (collectively, the "Cohort of 10") were allowed to take the HESI, but all failed on the first and second takings.   On their third, and under UAPB policy final, opportunity to pass the HESI, the Cohort of 10 were mistakenly administered the wrong test.   Administrators initially determined that the Cohort of 10 were not qualified to graduate because they had not passed the HESI.   On May 28, 2010, however, UAPB submitted a Plan of Action to ASBN.   In the Plan of Action, UAPB reported that it had agreed to give the Cohort of 10 a third opportunity to pass the HESI and to pay for a six-week remediation program through Southeast Arkansas College ("SEARK").   The Plan of Action also stated that UAPB would only require the Cohort of 10 to score an 850 or above to pass the HESI and receive their nursing degree, instead of the normally required score of 900.   The same had been communicated to the Cohort of 10 by letter on May 20, 2010.   The parties dispute whether UAPB mistakenly or intentionally wrote 850 instead of 900 for the required score.

In late June or early July of 2010, Ms. Sanders met with Dr. Benjamin in her office.   In her deposition, Ms. Sanders claimed that she met with Dr. Benjamin only once and that they had discussed "grade falsification and the treatment that we had received" (Dkt. No. 32-4, at 91).
In an affidavit attached to her response to defendants' motion for summary judgment, Ms. Sanders claims that Dr. Benjamin told her that, like with the Cohort of 10, "a score of 850 would be sufficient" (Dkt. No. 32-1, at 4). Dr. Benjamin denies having said this, and defendants maintain that, despite having had several prior opportunities to disclose this, this is new information disclosed for the first time in Ms. Sanders's affidavit attached to her summary judgment response.

On July 14, 2010, ASBN placed UAPB on conditional status, which required UAPB to submit to ASBN copies of the handbook and syllabi, to notify ASBN on any policy changes, and to comply strictly with its policies.  On July 19, 2010, UAPB held a meeting with the Cohort of 7, including Ms. Sanders.  UAPB advised the students that their Clinical Practicum grades would stand but that the course would be offered in the fall, with tuition waived, so that the Cohort of 7 could retake it immediately.  Students were also advised that going forward UAPB would be required to follow its policies strictly.

On July 23, 2010, the Cohort of 10 retook the HESI.  All scored above 850, but two scored below 900. Specifically, Angela Nash, who the parties agree had not complained to ASBN or UAPB administrators, scored above an 850 but below a 900.  Under the terms to which UAPB had agreed, all were eligible to graduate.  However, UAPB soon learned that the HESI administered was the same as the pre-test taken by the Cohort of 10 at the SEARK remediation course.  Initially, the Nursing Department determined that the Cohort of 10 would have to take another HESI.  The Cohort of 10 complained, leading then-Chancellor Lawrence Davis to review the situation.  Chancellor Davis determined that the Cohort of 10 had met the requirements that UAPB had previously communicated to the students and that the students should not be further punished for the school's mistake.  Being apprised of the situation, ASBN approved UAPB's decision to allow the two students who scored under a 900 to graduate because they achieved the 850 or above score agreed upon.  UAPB issued degrees to all Cohort of 10 students.

In the fall of 2010, six students from the Cohort of 7, including Ms. Sanders, retook Clinical Practicum.  Ms. Sanders signed acknowledgments that she received the handbook and syllabus reflecting that a score of 900 or higher on the HESI would be required.  All six students successfully completed the course and were eligible to take the HESI.  On the first taking, all

failed to score a 900 or higher and thus were required to retake the HESI.  Ms. Sanders received

an 867 (Dkt. No. 32-4, at 50).  In her deposition, Ms. Sanders admits that, at this point, she knew

a score of 900 or higher would be required (*Id.*, at 51, 54).  All students received remediation.

The remediation plan, which reflects Ms. Sanders's signature, states that a score of 900 or higher

on the HESI was required.  On the second taking, three students failed to score a 900 or higher,

including Ms. Sanders, after which those that failed received additional remediation.  On the

third taking, only Ms. Sanders failed to score a 900 or higher.  Consequently, all of the students

who retook the Clinical Practicum course, with the exception of Ms. Sanders, graduated and

received their nursing degrees.

In January 2011, Ms. Sanders filed a grievance, alleging that the Cohort of 10 were

treated more favorably because they were only required to achieve a score of 850 and were

provided an eight week remediation course at SEARK.  She also claimed that the Cohort of 7

wrongfully received a failing grade in Clinical Practicum, which led to disparate treatment

despite Verma K. Jones's, the Interim Dean for the School of Arts and Sciences, assurance that

they would receive the same opportunities and treatment as the Cohort of 10.

In February 2011, Ms. Sanders met with the Nursing Department's four-person grievance

committee.  After hearing Ms. Sanders's grievance and evidence, the committee upheld the

Nursing Department's decision requiring a score of 900 or higher on the HESI for the Cohort of

7.  As permitted by UAPB policy, Ms. Sanders appealed the committee's decision to the Interim

Dean for the School of Arts and Sciences, Yolanda Page, who held a meeting with Ms. Sanders

on March 31, 2011.  At this meeting, Ms. Sanders asked that she be allowed to graduate with a

score of less than 900, although she knew that a score of 900 or better on the HESI was required,

because others in the Cohort of 10 had previously been allowed to do so.  Dean Page upheld the committee's decision to adhere to the Nursing Department's policy.

Ms. Sanders did not formally appeal to Dr. Benjamin, the Vice Chancellor of Academic Affairs and final decision maker in academic appeals.  However, Ms. Sanders argues that this is because Dr. Benjamin refused to hear her appeal during a telephone conversation on January 6, 2011 (Dkt. No. 36, at 6).  Specifically, Ms. Sanders cites her deposition testimony recounting her telephone conversation with Dr. Benjamin:

> I then stated to Benjamin can I make an appointment to come and talk to you and present my case.  Dr. Benjamin state (sic):  you can but at the end of the day you will still not get your degree.  I stated to MS. (sic) Benjamin:  so let me get this right regardless of what proof I present to you showing you that I deserve my nursing degree the answer will still be no.  Dr. Benjamin then states:  Now Ms. Sanders that is not what I mean, what I mean is you can fill out the proper paper work and we will take a look at it.  She then gave me Ms. Jackson (sic) phone number and instructed me to give Ms. Jackson my email address so she could send me the correct paper work to fill out.

(*Id.*).  Defendants dispute that Dr. Benjamin refused to hear Ms. Sanders's appeal.

On January 13, 2013, Ms. Sanders filed this suit.  On June 12, 2013, Ms. Sanders filed a Second Amended Complaint, alleging that she was denied a degree in violation of her rights protected under the First and Fourteenth Amendments, actionable under 42 U.S.C. § 1983.

## II.    Standard of Review

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56;  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather,

the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).  However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### III.   Analysis

#### A.   Inconsistent Affidavit

To begin, the Court must consider whether the disputed issue of material fact that is created by Ms. Sanders's affidavit attached to her response to defendant's motion for summary judgment is genuine.  Ms. Sanders claims that Dr. Benjamin told her that she would be given a nursing degree if she made an 850 on her HESI.  Ms. Sanders makes this claim for the first time, despite numerous prior opportunities to do so, in the affidavit.  Specifically, Ms. Sanders states: "Dr. Benjamin and Dr. Jones had both told me I would be treated the same as the cohort of 10. She told me that a score of 850 would be sufficient" (Dkt. No. 32-1, at 4).

A plaintiff cannot "create a genuine issue of material fact simply by submitting an affidavit that contradict[s] testimony at a prior deposition, where there were no 'legitimate reasons' for the filing of an inconsistent affidavit."  *Frevert v. Ford Motor Co.*, 614 F.3d 466, 474 (8th Cir. 2010) (quoting *Roberts v. Park Nicollet Health Serv.*, 528 F.3d 1123, 1126-27 (8th Cir. 2008) (quoting *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir.

1983)).  "[D]istrict courts should examine inconsistent submissions 'with extreme care,' and limit the grant of summary judgment to cases where a conflict between deposition and affidavit presents 'only sham issues.'"  *Roberts*, 528 F.3d at 1126-27 (quoting *Camfield Tires, Inc.*, 719 F.2d at 1366).  An inconsistent affidavit can generate a genuine issue of fact only if it does "not purport to raise a new matter, but rather to explain certain aspects" of previous testimony, or if confusion contributed to the inconsistency.  *Camfield Tires, Inc.*, 719 F.2d at 1364 (quoting *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894-895 (5th Cir. 1980)).  "If testimony under oath . . . can be abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment."  *Id.* at 1365.

In *Frevert*, the Eighth Circuit disregarded an affidavit as "self-serving" because it sought "to *add* a crucial element . . . to [plaintiff's] cause of action that was *never* alleged in the complaint."  614 F.3d at 474.  In *Camfield*, the Eighth Circuit found that plaintiff did not create a genuine issue of material fact simply by submitting an affidavit that conflicted with earlier testimony where there were no legitimate reasons for filing an inconsistent statement, such as to explain prior testimony or the inconsistency caused by the testifier's confusion.  719 F.2d at 1365.  Conversely, in *Roberts*, the Eighth Circuit found that an inconsistent affidavit created a genuine issue of fact because it did not attempt to replace prior harmful information with a more favorable version, concluding instead that confusion seemed to be the cause.  528 F.3d at 1127.

Here, Ms. Sanders's affidavit directly contradicts her prior testimony.  During her deposition, Ms. Sanders explained that she met with Dr. Benjamin in "early July or late June" of 2010 and that they discussed "grade falsification and the treatment that we had received" (Dkt. No. 32-4, at 91).  She also testified that this was her only meeting with Dr. Benjamin (*Id.*).  Also in her deposition, Ms. Sanders admits that she knew a score of 900 or higher would be required

(*Id.*, at 51, 54), as she made no complaint when forced to retake the HESI after scoring an 867 on her first attempt (*Id.*, at 50).  In her affidavit, however, Ms. Sanders claims for what defendants characterize as the first time that Dr. Benjamin told her in July of 2010 that "a score of 850 would be sufficient" (Dkt. No. 32-1, at 4).  Essentially, Ms. Sanders first said that her discussion with Dr. Benjamin involved grade falsification and UAPB's treatment of the students, but she now insists they also discussed her requirements moving forward.  Further, Ms. Sanders's inconsistent statement replaces prior harmful information—that, unlike the Cohort of 10, she was never told a score of 850 would be sufficient—with a more favorable version—that she was told a score of 850 would be sufficient.  *See Roberts*, 528 F.3d at 1127; *Frevert*, 614 F.3d at 474.

Further, attempting to explain prior testimony or Ms. Sanders's own confusion are unlikely causes, as this most recent version of the story is just now being told despite Ms. Sanders's numerous prior opportunities to relay this information and put herself in a better position.  *See Camfield*, 719 F.2d at 1365 (finding confusion to be the cause where plaintiff had gone back and forth on what date a fact occurred, and the affidavit did not put him in a more favorable position).  Specifically, based on the record before the Court, Ms. Sanders failed to disclose Dr. Benjamin's promise when she signed acknowledgments that a score of 900 or higher on the HESI would be required; after scoring an 867 on her first HESI; to the grievance committee in February 2011; and to Dean Page, who heard her appeal on March 31, 2013.  She also did not allege it in her original complaint (Dkt. No. 1); her amended complaint (Dkt. No 5); her second amended complaint, which was filed to name Dr. Benjamin as a defendant (Dkt. No. 22); or during her deposition after being asked about her conversations with Dr. Benjamin (Dkt. No. 32-4, at 91).  Instead, Ms. Sanders retook the HESI without complaint after scoring an 867 and, during her deposition, admitted to knowing that she was required to score a 900 or higher.

For these reasons, the Court finds that there are no legitimate reasons for entering an inconsistent affidavit and thus Ms. Sanders's affidavit presents "only sham issues." *Roberts*, 528 F.3d at 1126-27.   Accordingly, the Court will first analyze defendants' motion for summary judgment without considering Ms. Sanders's affidavit to the extent that it is inconsistent with her prior testimony.   Regardless, for the reasons discussed below, the Court determines that, even if Ms. Sanders's affidavit is taken as true, she still has not made a First Amendment retaliation or procedural due process claim.

### B.   Official Capacity Requirements

An official capacity suit is the equivalent of a suit against the governmental entity of which the individual is an agent and imposes liability on the entity that the individual represents. 42 U.S.C. § 1983 (1996).   To prevail in an official-capacity lawsuit, a plaintiff must first establish that she suffered a deprivation of a federal right.   *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  The plaintiff must then prove that the entity's "policy or custom" played a part in the violation of federal law.   *Id.*   Plaintiff must include allegations, references, or language by which one could infer the conduct alleged resulted from an unconstitutional policy or custom. *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 591 (8th Cir. 2004) (citing *Doe v. Sch. Dist. of Norfolk,* 430 F.3d 605, 614 (8th Cir. 2003)).

"Policy or custom" can come from the decisions of any officials "whose edicts or acts may fairly be said to represent official policy."   *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).  In the context of municipal liability, for example, the Supreme Court has explained that an "official policy" can include "a single decision by municipal policymakers . . . because even a single decision by such a body unquestionably constitutes an act of official government policy."   *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).  "[T]he trial

judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue" by "[r]eviewing the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (internal quotation marks omitted).

Ms. Sanders argues that Dr. Benjamin's role as final policymaker for academic appeals is comparable to that of municipal policymakers and, as such, her decision to deny her appeal was "policy." The Court agrees in part and disagrees in part. It is undisputed that Dr. Benjamin had final decision-making authority in academic appeals, and, thus, her decisions on academic appeals are policy (Dkt. No. 33, at 12, ¶ 31). However, the facts show that Dr. Benjamin made no decision on Ms. Sanders's academic appeals, as Ms. Sanders never formally appealed Dean Page's decision.

Regardless, Ms. Sanders was denied a degree because of an official UAPB policy. Namely, UAPB policy required Ms. Sanders to score a 900 or higher on the HESI, despite the school having previously awarded degrees to other students who had scored less than 900. Thus, the Court must now determine whether the denial of Ms. Sanders's degree because of the enforcement of this policy, and UAPB's decision not to make an exception to this policy for Ms. Sanders, deprived her of her federal rights under the First and Fourteenth Amendments.

### C.      Individual Capacity Requirements

Ms. Sanders also brings a claim against Dr. Benjamin in her individual capacity. To establish personal liability under § 1983, the claim must be brought against the individual who allegedly engaged in the illegal conduct. *See Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th

Cir. 2006) ("Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights."); *see also Beck v. LaFleur*, 257 F.3d 764, 765-66 (8th Cir. 2001). Plaintiff must allege "specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Mayorga*, 442 F.3d at 1132. Ms. Sanders claims that Dr. Benjamin "failed to allow Plaintiff to receive her Degree in retaliation for complaining and in violation of Plaintiff's Due Process rights," "failed to give Plaintiff appropriate notice for academic dismissals," and refused to hear her appeal (Dkt. No. 34, at 6). The Court finds that Ms. Sanders has alleged sufficient facts of Dr. Benjamin's personal involvement so as to allow the Court to reach the merits of her claims.

### D.     First Amendment Retaliation Claim

To establish a *prima facie* case of retaliation under the First Amendment, a plaintiff must show that her conduct was constitutionally protected and that the protected conduct was a substantial or motivating factor in the defendants' adverse action. *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 865 (8th Cir. 2009) (citing *Altonen v. City of Minneapolis*, 487 F.3d 554, 559 (8th Cir. 2007); *Cox v. Dardanelle Pub. Sch. Dist.*, 790 F.2d 668, 672-76 (8th Cir. 1986)). If plaintiff makes out a *prima facie* case, the burden shifts to defendant to show that it would have taken the same action regardless of plaintiff's protected speech. *Id.* (citing *Altonen*, 487 F.3d at 559); *see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

Defendants assume for purposes of summary judgment that Ms. Sanders's complaints about her grade were protected speech, but defendants argue that her complaints were not a substantial or motivating factor in the adverse action taken against her. Even if Ms. Sanders can

meet the burden of showing her speech was the substantial or motivating factor, defendants argue that they would have taken the same action regardless of Ms. Sanders's complaints.

### 1.    Ms. Sanders's Protected Speech Was Not A Substantial Or Motivating Factor In Defendants' Action.

"A substantial or motivating factor can be proven through either direct or indirect evidence." *Wagner v. Jones*, 664 F.3d 259, 271 (8th Cir. 2011) (citing *Davison v. City of Minneapolis*, 490 F.3d 648, 655 n.5 (8th Cir. 2007)).   "A plaintiff need only prove that the employer's discriminatory motive played a *part* in the adverse employment action." *Id.* (citing *Davison*, 490 F.3d at 657).   In considering whether there is a causal connection between protected activity and an adverse action, the Eighth Circuit has held that more than a temporal connection is generally required to present a genuine issue of material fact on a retaliation issue. *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999), *cert. denied*, 528 U.S. 818 (1999); *Nelson v. J.C. Penney Co.*, 75 F.3d 343, 346-47 (8th Cir. 1996), *cert. denied*, 519 U.S. 813 (1996); *Feltmann v. Sieben, Inc.*, 108 F.3d 970, 977 (8th Cir. 1997), *cert. denied*, 522 U.S. 1075 (1998); *Cram v. Lamson & Sessions Co.*, 49 F.3d 466, 474 (8th Cir. 1995).   Further, the Eighth Circuit has held that an interval of two months between the time of a complaint and an adverse action is insufficient to establish any inference of causation, *see Kipp v. Mo. Hwy. & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002), and that a two-week interval was "sufficient, but barely so," *Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 833 (8th Cir. 2002).

To establish a temporal connection, Ms. Sanders argues that the correct time interval for the Court to consider is the time between her first individual meeting with Dr. Benjamin in July 2010, at which she told Dr. Benjamin she had complained to the ASBN, and the meeting between UAPB and the Cohort of 7 on July 19, 2010, at which UAPB announced that going forward it would strictly follow its policies.   Defendants argue that the time interval should be

measured from the time of Ms. Sanders's first grievance to the ASBN regarding her grade in Clinical Practicum, which occurred in April 2010, and when UAPB made the final decision to enforce its 900 or higher policy and deny Ms. Sanders a degree, which occurred in January 2011.[2]

The Court finds that, pursuant to Eighth Circuit precedent, the time interval should begin at the time of the protected conduct, not when Ms. Sanders contends Dr. Benjamin supposedly learned of it.[3]  *See, e.g.*, *Couty v. Dole*, 886 F.2d 147, 148 (8th Cir. 1989) (holding discharge thirty days *after protected activity* was insufficient to establish inference of causation); *Keys v. Lutheran Family & Children's Servs. of Mo.*, 668 F.2d 356, 358 (8th Cir. 1981) (holding discharge less than two months *after EEOC charge filed* was sufficient);  *Peterson v. Scott Cnty.*, 406 F.3d 515, 525 (8th Cir. 2005) (holding discharge two weeks *after protected activity* to be sufficient), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011).  Ms. Sanders's protected conduct was in April 2010.  Measuring from this date, even if the Court stops the time interval at the July 19, 2010, meeting, it is over three months, which is insufficient to establish an inference of causation.  *See Kipp*, 280 F.3d at 897.

---

[2]  The Court does not understand Ms. Sanders as basing her First Amendment retaliation claim on the January 2011 grievance.  To the extent she purports to do so, that claim has no merit.  The January 2011 grievance was filed after UAPB opted not to grant Ms. Sanders an exception to the requirement that she score a 900 on the HESI to obtain a degree.  There is no indication on this record that the January 2011 grievance impacted UAPB's initial decision in this regard.

[3]  Even if the Court were to begin counting the time interval from the date Dr. Benjamin first learned of the protected conduct as Ms. Sanders suggests, that date likely would be sometime well before July 2010 based on this record.  From her April 2010 grievance, many UAPB officials were involved in addressing Ms. Sanders's concerns.  Further, the parties do not dispute ongoing monitoring between the ASBN and UAPB regarding these concerns from April 2010 to July 2010 and beyond (Dkt. No. 33, ¶¶ 10-12).  Based on these undisputed facts, the Court concludes no reasonable juror could determine that Dr. Benjamin by virtue of her position at UAPB first learned of student complaints in the July 2010 meeting with Ms. Sanders.

If Ms. Sanders could demonstrate a temporal connection, Eighth Circuit case law requires Ms. Sanders demonstrate more to survive summary judgment. *See, e.g.*, *Kiel, Inc.*, 169 F.3d at 1136. The Court finds that, from the undisputed facts, she has failed to do so. No reasonable juror could conclude that Ms. Sanders's complaints motivated UAPB's actions. In fact, there is no indication there was any retaliation based on Ms. Sanders's speech, as UAPB simply followed its preexisting policy. Her purportedly protected speech occurred in April 2010, when UAPB's policy required students to score a 900 on the HESI to complete the degree requirements. UAPB enforced its policy, requiring Ms. Sanders and all in the Cohort of 7 to score a 900 on the HESI to earn their degrees.

According to Ms. Sanders, however, UAPB retaliated against her by not affording her an exception to its policy. Yet UAPB gave no student in the Cohort of 7 such an exception. Even if other students in the Cohort of 7 had been given such an exception, Ms. Sanders admits that other students in her class who complained to ASBN were allowed to graduate. If UAPB was motivated to retaliate against Ms. Sanders for her complaints, Ms. Sanders offers no explanation as to why UAPB did not retaliate against her classmates who made similar complaints. The complaints Ms. Sanders alleges she made were not directed to Dr. Benjamin or those on the grievance committee who reviewed the ultimate decision regarding Ms. Sanders's degree. Her complaints purportedly related to "grade falsification" and her belief she did not receive credit for all the points she earned in classes. It is unclear why she believes those types of complaints would trigger a response by Dr. Benjamin or members of the grievance committee directed solely at her and not all classmates who complained. Also, Ms. Sanders admits that some of the people she now claims retaliated against her made various efforts to help her graduate even after her complaints. Such efforts included giving approval for course substitutions, reimbursing her

tuition, and excusing her absence from a course so she could take the HESI.  It is unlikely that those who once attempted to help her graduate would then retaliate by wrongfully denying her a degree.

Because the facts do not indicate retaliation when considering the Cohort of 7, Ms. Sanders's First Amendment retaliation claim, as advanced by her, depends on a comparator analysis as to the Cohort of 10.  Ms. Sanders contends that she was not given an exception to the policy requiring a HESI score of 900 or more when an exception was given to the Cohort of 10 and specifically to Ms. Nash, a member of the Cohort of 10 who Ms. Sanders contends did not complain or engage in protected speech.  At its essence, Ms. Sanders alleges that, because Ms. Nash did not complain and was permitted to graduate with a HESI score of less than 900, Ms. Sanders, who did complain but was not permitted to graduate with a HESI score of less than 900, had to have been singled out because of her complaint.  The undisputed facts do not support this theory.

Without considering her self-serving affidavit, there is no basis for Ms. Sanders's claim that she is situated similarly to Ms. Nash or any member of the Cohort of 10.  The parties do not dispute the Cohort of 10 received confirmation in writing from UAPB that a score of 850 on the HESI would suffice and that UAPB made the decision to honor that representation and seek advanced permission from the ASBN to do so.  Unless the Court considers her affidavit, Ms. Sanders cannot claim she received such a promise or claim she had a reasonable expectation that UAPB would make an exception to the HESI score requirements for her.

Even if the Court considers the self-serving affidavit submitted by Ms. Sanders, the Court's determination does not change.  The Court still rejects the notion that Ms. Nash or any member of the Cohort of 10 is a proper comparator for Ms. Sanders.  The Cohort of 10 received

a written promise that was never contradicted.  UAPB informed ASBN of its intention to allow the Cohort of 10 to graduate with a score of 850 or higher on the HESI on May 28, 2010, before being placed on conditional status (Dkt. No. 33, at 4, ¶ 13), and asked for the exception a mere two weeks after being placed on conditional status (*Id.*, at 7, ¶ 21).  Conversely, Ms. Sanders alleges in her affidavit that she received an oral promise only—not a written letter—sometime in July, 2010, that she admits was later contradicted by UAPB on July 19, 2010.  Ms. Sanders does not dispute that, after July 19, 2010, she was informed of the need to score a 900 or higher on the HESI.  Ms. Sanders was provided notice through the student handbook, the Fall 2010 syllabus, and the remediation plan—all of which were given to her after the July 19, 2010 meeting.  These factual differences, among others, preclude the Cohort of 10, or Ms. Nash specifically, from serving as a proper comparator.

Putting aside the comparator analysis, when examining the undisputed facts of this case with the self-serving affidavit, the timeline of Ms. Sanders's alleged facts does not support her claim that protected speech motivated retaliation by UAPB.  Ms. Sanders contends she engaged in protected speech in April 2010 when she filed her first grievance and complained to ASBN (Dkt. No. 34, at 10; Dkt. No. 33, at 2, ¶¶ 4-6).  Ms. Sanders claims that, in her only conversation with Dr. Benjamin, she told Dr. Benjamin she hoped her complaint to ASBN would not affect her future, and Dr. Benjamin assured her it would not (Dkt. No. 32-1, at 4).  Accepting Ms. Sanders's version of events as true, Dr. Benjamin knew Ms. Sanders had complained when in July 2010 Dr. Benjamin purportedly told Ms. Sanders a score of 850 or higher on the HESI would be sufficient.  Because there is no allegation that Ms. Sanders engaged in any further protected speech between the time of the July 2010 conversation and when Ms. Sanders was held

to the standard of scoring a 900 or higher on the HESI to earn her degree, there is no evidence on this record that speech by Ms. Sanders motivated any alleged change in position.

The Court determines that, on the record before it even construing all facts in favor of Ms. Sanders, no reasonable juror could conclude that Ms. Sanders's conduct was a substantial or motivating factor in the defendants' adverse action against her. Therefore, the Court grants defendants' motion for summary judgment regarding Ms. Sanders's First Amendment retaliation claim.

### 2. Defendant Would Have Taken The Same Action Regardless Of Ms. Sanders's Protected Speech.

Even if Ms. Sanders's speech was the motivating factor behind defendants' decision to deny her a degree, defendants argue that they would have taken the same action regardless of Ms. Sanders's complaints. *See Mt. Healthy City School Dist. Bd. of Education*, 429 U.S. at 287. The Court agrees. Nothing about Ms. Sanders's treatment deviated from UAPB policies as set forth in the nursing handbook and which UAPB's conditional status required it to follow strictly. All the other members of Ms. Sanders's class including all other members of the Cohort of 7 were required to achieve a 900 or higher. Further, members of the Cohort of 10 are not proper comparators, regardless of whether the Court considers Ms. Sanders's inconsistent affidavit, as discussed above.

On July 14, 2010, ASBN placed the UAPB nursing program on conditional status and required it strictly follow its policies, which at least implicitly included the requirement of scoring a 900 or higher on the HESI. That requirement already existed at the time of Ms. Sanders's complaints; the parties do not dispute that creation of the policy had nothing to do with her allegedly protected speech. The Court concludes that, on this record, no reasonable juror could conclude enforcing the policy resulted from her allegedly protected speech. UAPB was

very forthcoming about ASBN's mandate and its implication for the nursing students:  Dr. Benjamin and other administrators met with the Cohort of 7, including Ms. Sanders, to explain the situation within days of ASBN placing UAPB on conditional status.  Once this message was communicated to the Cohort of 7, the message did not change.  Ms. Sanders does not dispute that, after July 19, 2010, she was informed of the need to score a 900 or higher on the HESI.  Ms. Sanders was provided notice through the student handbook, the Fall 2010 syllabus, and the remediation plan—all of which were given to her after the July 19, 2010, meeting.  For these reasons, the Court determines that UAPB denied Ms. Sanders a degree based on its conditional status and requirement to strictly follow its policies and consequently would have taken the same action regardless of Ms. Sanders's allegedly protected activity.

### E.   Procedural Due Process Claim

Institutions of higher education and their faculty have more flexibility in dealing with procedural due process for academic dismissals than for student dismissals based on misconduct. *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 86 (1978).  A student who is dismissed for academic reasons must be given notice of faculty dissatisfaction and potential dismissal, and the decision to dismiss must be careful and deliberate.  *Id.* at 85-86.  A formal hearing is not required for an academic dismissal.  *Id.* at 86 n.3; *see Disesa v. St. Louis Cmty. Coll.*, 79 F.3d 92, 95 (8th Cir. 1996); *Ikpeazu v. Univ. of Neb.*, 775 F.2d 250, 254 (8th Cir. 1985). The student must only be given "an explanation of the evidence the authorities have and an opportunity to present his side of the story."  *Horowitz*, 435 U.S. at 85-86 (quoting *Goss v. Lopez*, 419 U.S. 565, 581 (1975).

Ms. Sanders claims that the process UAPB provided her after her academic dismissal was not constitutionally sufficient.  Ms. Sanders was provided notice of the need to attain a score of

900 or higher on her HESI Comprehensive Exit Exam through the student handbook, the Fall 2010 syllabus, and the remediation plan—all of which were given to her after she contends Dr. Benjamin told her a score of 850 would be enough.  When she did not achieve a score of 900 or higher, and thus did not receive her nursing degree, she was afforded a hearing with a grievance panel and then with Dean Page.  At both hearings, Ms. Sanders had a representative with her and was afforded the opportunity to present evidence.  Both the grievance panel and Dean Page decided against Ms. Sanders.

Despite all of this, Ms. Sanders argues she was not afforded procedural due process because Dr. Benjamin refused to hear her appeal of the prior hearings in violation of UAPB's policy.  In support of this position, Sanders quotes her deposition testimony recounting a telephone conversation she had with Dr. Benjamin on January 6, 2011:

> I then stated to Benjamin can I make an appointment to come and talk to you and present my case.  Dr. Benjamin state (sic):  you can but at the end of the day you will still not get your degree.  I stated to MS. (sic) Benjamin:  so let me get this right regardless of what proof I present to you showing you that I deserve my nursing degree the answer will still be no.  Dr. Benjamin then states:  Now Ms. Sanders that is not what I mean, what I mean is you can fill out the proper paper work and we will take a look at it.  She then gave me Ms. Jackson (sic) phone number and instructed me to give Ms. Jackson my email address so she could send me the correct paper work to fill out.

(Dkt. No. 36, at 6).  Construing Ms. Sanders's testimony in the light most favorable to her, Dr. Benjamin did not deny Ms. Sanders an appeal.  In fact, Dr. Benjamin facilitated Ms. Sanders's grievance by giving her instructions on how to proceed.  Afterward, Ms. Sanders did proceed, filing her grievance in January 2011, meeting with the grievance committee in February 2011, and then appealing to Dean Page in March 2011.  Dr. Benjamin forwarded Ms. Sander's initial paperwork to the appropriate person to initiate the grievance process and did not interfere with it.

Yet when Dean Page ruled against Ms. Sanders in April 2011, Ms. Sanders did not appeal the decision to Dr. Benjamin, who would have been looking at her evidence for the first time.

The procedural process provided Ms. Sanders goes far beyond that required for academic dismissals. *See Horowitz*, 435 U.S. at 85-86. Ms. Sanders was given notice of the requirement to score a 900 on her HESI and of the potential dismissal if that score was not achieved. Although not constitutionally required, Ms Sanders was given two hearings under UAPB policies. Further, Ms. Sanders did not exhaust the process made available to her by UAPB. If Ms. Sanders had appealed to Dr. Benjamin and Dr. Benjamin had ruled against her, Ms. Sanders might have an argument that her decision was not "careful and deliberate," *see Horowitz*, 435 U.S. at 85–86, based on Dr. Benjamin's comment that "you can [present your case] but at the end of the day you still will not get your degree." However, Ms. Sanders never appealed to Dr. Benjamin, and Dr. Benjamin did not make the final determination. There is no evidence that the prior two hearings were anything but "careful and deliberate." Thus, the Court grants summary judgment regarding Ms. Sanders's procedural due process claim.

As with her First Amendment claim, the Court's finding on Ms. Sanders's procedural due process claim would not change even if it considered Ms. Sanders's inconsistent affidavit. Dr. Benjamin's alleged promise speaks to, if anything, Ms. Sanders's substantive claims, not the amount of process she received to address it. Even if Dr. Benjamin made the promise, Ms. Sanders's dismissal was still academic in nature, and thus the procedural process provided to Ms. Sanders is more than sufficient. *See id.*

Further, Ms. Sanders does not bring a substantive due process claim (Dkt. No. 34, at 15). Thus, parties' discussion of *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 225 (1985), a case decided entirely on substantive due process, is misplaced.

**F.      Qualified Immunity**

A government official sued in her individual capacity may raise the defense of qualified immunity.  The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Stepnes v. Ritschel*, 663 F.3d 952, 960 (8th Cir. 2011) (internal quotation marks omitted).  To determine if a qualified immunity defense applies, the Court must conduct a two-prong inquiry by examining: "(1) whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right and (2) whether the constitutional right violated was clearly established at the time of defendant's alleged misconduct."  *Id.* (alteration in original) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)) (internal quotation marks omitted).  "Unless the answer to both of these questions is yes, the defendants are entitled to qualified immunity."  *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009).  Because the Court finds that the facts taken in the light most favorable to Ms. Sanders do not make out a violation of a constitutional right, Dr. Benjamin is entitled to qualified immunity.

*   *   *

For these reasons, defendants' motion for summary judgment is granted.

_____
KRISTINE G. BAKER
UNITED STATES DISTRICT JUDGE